Mr. Gartz? Good morning, your honors. Can I please the court, counsel to the government? The facts of the case here are not disputed. The key question that's presented is whether and by the Lopez and Morrison 18 U.S.C. 844i applies to the arson of a church building, and if so, whether its application to the building in this particular case is constitutional. The answer to the first question is maybe, but the answer to the second question is no. To properly answer these questions, the court must decide whether the building is actively used for commercial purposes and whether those activities have a substantial impact on interstate commerce. In Jones v. The United States in 2000, the Supreme Court clarified that use in an activity affecting commerce, that language, is most sensibly read to mean active employment for commercial purposes and not merely a passive, passing, or past connection to commerce. They rent out the facilities using that building for the business operations, do they not? They do occasionally. We're talking about the administrative building, not the place where the church services are held. That's correct. So they have a, and again, this was, I know this firsthand, I don't know if the Reverend Balke laid all this out exactly, but the church office building is really small. You know, a hundred yards away, there's a building called Brose Hall, and that hall is occasionally rented out. It's primarily used for the church to have activities and, you know, after church things, but it's occasionally rented out. You know, for example, my children go to Cotillion there on Sunday nights. I don't know what it costs to have the Cotillion rent the building, but that's what they do. They rent it out for town halls? I'm sorry? They rent it out for town halls? I've never, I think the word town hall showed up in there, but I've never heard of it being rented out for that. Parties? Parties, yes. Receptions? Yes. All to the general public? Yes. The general public is open to use it, but they rent it through- Dances. I'm sorry? Dances. They rent it out for dances. Yes, the Cotillions, yes. All right. Yes. So that commercial activity, though, is used, obviously, to fund stuff for the church. It's not used for, to the extent we call that commercial activity, I guess, it's not used for, you know, profit making or anything of that nature. And the primary uses of those things, and again, I don't know exactly what kind of parties Reverend Balke was referring to, but I imagine the Cotillion, I would consider Cotillion to be educational purposes, not, you know, nobody's profiting off of that. And that's the primary thing that I've seen and observed them using it for. Well, and all churches, as I understand it, have to be careful about that. If they become profit making, then they have a tax exemption issue, at least as to part of the facilities. Absolutely. And I think Reverend Balke was very careful to talk about how little money they make off of it. He was, you know, pretty candid about that. When I asked him about are you making money on this, are you making money on this, he, no, no, no, we don't make any money. Our Amazon Smile account made $30 in 2018. It was very limited amounts of funds. Okay, but still the answer to your first question is yes, it's commercial activities. I think there is a commercial aspect to the use of that particular building. That's correct. I disagree that the after school program is commercial. I know that people pay for that, but it's part and parcel attached to the All Saints Episcopal School, which is a pre-K to eighth grade school that is not run out of that church office building, but rather has its own office building. You need to be pretty careful about not going outside the record. I understand you've had personal involvement, which is fine. Yes, Judge. Well, and Reverend Balke talked about that. We specifically asked him about, you know, is the after school program, you know, tied to the school itself? In other words, where do you pay the tuition? He said they pay the tuition to us for the after school aspect of it rather than to All Saints. So he discussed that, is my recollection, Judge. But the provision of child care services can be linked to interstate commerce. Well, I would argue that it's intrastate commerce. It's local. These are all local kids. They all live in, you know, the Beaumont area. All right, so we've got to link to commerce, though. Yes, potentially. All right. Yes. But, again, I think the key piece here, the key trouble that we get into is the Lopez question, the substantial effect on interstate commerce question. And, you know, as you all are aware, the Supreme Court considered that question and really required that the phrase substantially be attached to the word effect. It's not just some effect. It's not a minimal effect. It has to be substantial. And, you know, the court there wrote that if we don't use the word substantial, then anything counts, and the government can regulate anything that they want via the interstate commerce clause. And so the key word there is, and we would contend, is substantially effects. And here there are lots of churches that are engaged in what I would consider substantial impact activities on interstate commerce. For example, the megachurches that have a multistate presence, or a multistate TV presence anyway, a traveling church that does revivals in multiple states and takes money from people in multiple states, those types of churches have a substantial impact on interstate commerce. But here the office building itself in particular, the primary function is spiritual, educational, and charitable activities. Reverend Balki confirmed all of those things. And that their primary purpose is not really commercial activity. They don't make any products. They don't sell anything. They don't, you know, obviously they don't make any profit or pay any taxes, as you all have recognized before. And interestingly, 844B specifically defines interstate commerce, and it says commerce between any place in a state and any place out of a state. That's the language from 844. That's not just a general understanding. And so even if we rely on the trial court's reasoning that the building was used to operate the after-school and child care programs that we've talked about, or the rental of the facilities, and thus has some economic activity or commercial activity, there's no evidence that that activity has any impact on interstate commerce, much less a substantial one. And so, you know, the thought process potentially is that if tomorrow, if that St. Stephen's office building were to close, that decision would not have more than a scintilla of impact on interstate commerce. In other words, commerce, again, using the definition, between people in Texas and people in any other state. As such, we are asking this court to reverse the conviction and render a judgment of acquittal as to count one. Unless the court has further questions, I'll waive my time until rebuttal. Thank you. May it please the court. Bethany Pickett for the United States. Your Honors, both parties agree on the correct test to be applied in this case. Both parties agree that the bombing of a church-owned building can violate Section 844I so long as that building is either used in or affects interstate commerce. Now, the government's brief outlines all the various reasons why the defendant's bombing of the church's administrative building affected interstate commerce. But I want to highlight three facts in the record that he does not dispute that are each independently sufficient to uphold the verdict. First, the church's administrative building was used to rent out its facilities to the public for commercial purposes. Second, the church used this building to operate its nursery care program, its after-school program, and its summer school program. And third, the church used this building to provide funeral services. Each of these facts are independently sufficient to uphold the verdict. First, the bombed building was used to rent out or lease facilities for commercial purposes. Under United States v. Russell, the rental of real estate is unquestionably an activity affecting interstate commerce under 844I. Here, the church rented out its main fellowship hall to vendors so that they could then sell their own products. The rental fees for this facility ranged in price but could be upwards of thousands of dollars here. And the church rented out its facility, as mentioned, for private receptions, for birthday parties, for town hall, for cotillion, for dances, and for other nonreligious gatherings. These events were purely secular and not really involved in the religious function of the church. Did you have to be a member of the church to be able to rent it for a private reception? No, Your Honor. This was open to the public. You could simply ask the church, and the church, for a fee, would enable you to rent out its facilities for commercial purposes. And so all of these business activities related to the rental facilities were handled in the administrative building that the defendant bombed. And the Fifth Circuit law on this is clear, that this court has recognized in United States v. Corona when it reasons that the rental of real estate is part of commerce. That's 108F 3rd 565. And then, likewise, in United States v. Dawes, this court similarly held that arson fires involving commercial properties affect interstate commerce. So the church's leasing of its facilities alone is sufficient to establish the interstate commerce nexus as established in United States v. Russell. And this alone can serve for affirming the verdict below. But secondly, the building was also used to charge tuition for its child care programs, which includes its nursery care program, its after school program, and its summer school program. And these are activities that also affect interstate commerce under 844I, as both the Fourth Circuit and the Tenth Circuit have recognized. Here the church received tuition payments for these programs. The church hired staff and had staff located in the administrative building. And the church also purchased supplies for these programs. This all took place in the administrative building that the defendant bombed. And so the Fourth Circuit in United States v. Terry held that regardless of a religious organization's effect on interstate commerce, the daycare's presence single-handedly transforms the building into one that is being actively employed for commercial purposes. Likewise, in United States v. Gillespie, the Tenth Circuit held that housing a daycare also single-handedly transforms a place of worship into one that is actively employed for commercial purposes. But the facility at issue in United States v. Gillespie was a pre-K that charged tuition, similar to what we have here with the tuition being charged for the child care services. And the church is therefore actively engaged in commercial activity by participating in the market for child care services. Now the defense raised the fact that the church was not being used for profit-making. But, Your Honors, that's irrelevant. Camp's Newfoundland Supreme Court opinion that establishes that nonprofits can be engaged in interstate commerce. Whether the church made a profit or not is irrelevant to this test. The defense also raised the fact that child care services were purely local here. But, Your Honor, I submit to you that that too is irrelevant here. In fact, United States v. Russell specifically held that the rental of a local apartment was an element of a much broader commercial market and rental properties and therefore affected interstate commerce. Likewise, in United States v. Terry, the court held that the fact that an activity takes place solely in one state is not dispositive. Otherwise, this would call into question the entire commerce clause precedent from the Supreme Court, such as Katzenbach, all these barbecues, all of these cases where there was interstate activity that affected interstate commerce. But finally, the third factor is that the building was used to provide funeral services. Which this court has previously held satisfies the interstate commerce element of 844i. Here the church received cremated remains from deceased in-state and out-of-state parishioners, both through the mail and through in-person delivery. The church purchased urns from a supplier located out-of-state in New York. And the administrative building was the place that the church used to process all of the fees for its funeral services and the paperwork as well. And this court has specifically held, although in an unpublished opinion, that an organization's participation in the funeral industry is sufficient to satisfy Section 844i's interstate commerce element. In United States v. Caldwell, this court held that the evidence is sufficient to satisfy the interstate commerce element where a funeral home purchased caskets that were manufactured out-of-state and that bodies had shipped to and from out-of-state. This church was providing a service. This church was engaged in the commercial market for funeral supplies for other individuals. This church's provision of funeral services processed out of the administrative building that the defendant bombed is accordingly an independently sufficient basis to affirm this conviction. Your Honor, in closing, the defendant simply has not addressed, even today, the Keith Law and his appeal. So long as the church building was used for renting out its facilities or for operating tuition-based child care programs or for providing funeral services, how does this not affect interstate commerce? Under his proposed rule, what would affect interstate commerce? The government has presented... Well, the word substantially is there. Your Honor, the word substantially is there, and I would submit to you that the child care services, the funeral services, and the rental facility does substantially affect interstate commerce. But I would also note this Court's opinion, United States v. Dawes, which occurred after Lopez, where this Court held that an effect on interstate commerce is required, not a substantial effect on interstate commerce. And Dawes was an unpublished opinion, but it did cite United States v. Robinson, which was a published opinion, where this Court called the post-Lopez substantial effects theory proposed by the defendant simple and elegant but wrong. Your Honor, the government has presented sufficient, indeed overwhelming, evidence that St. Stephen's Church meets 844i's interstate nexus element. Coupled with this Court's sufficiency review, which is highly deferential to the verdict, the lower court's decision should be upheld. And if there are no further questions, I'll yield back the remainder of my time. Mr. Gertz. Thank you, Your Honor. The Russell case cited by Raleida and by counsel was actually specifically mentioned in the Jones opinion in 2000 by the U.S. Supreme Court. That case was very distinct from this because that was a property owner trying to burn his own property that he listed for and rented for profit to other people. This is not a rental facility where the facility is being rented out every day, but rented out on occasion, essentially for a nominal fee, rented out to organizations on occasion. So the Russell, while rental facilities may be the language that was used, that was much more akin to an apartment building or something of that nature that the owner was trying to seemingly commit insurance fraud or arson or whatever. Was there evidence of how frequent it was used? I'm sorry, Your Honor? Was there evidence of how frequently this was rented out? Reverend Balki didn't really give us any sort of dates and times for things of that nature. It did not—it didn't come out on the record, I don't think, is how often it was. And I guess one of the challenges here that is maybe not clear to the court is everyone that was in this room, the judge, both counsel, Reverend Balki, are all very familiar with this particular location. And so we all—some stuff may not be coming through in the record just because of our familiarity with it. But I don't think that question was specifically asked or answered. He didn't provide us any books or records, financial records or anything of that nature, to show what— So it could be every weekend? One weekend, you just really don't know? We just don't know. The record is silent on that. I would point out that that was kind of—I mean, the government knew exactly what we were there for in that first hearing, as you'll recall, too. We actually had two different hearings. One was the bench trial itself, but the testimony of Reverend Balki was in a previous hearing. Where we were talking about jurisdiction and ultimately decided to do a bench trial. But the— What case do you rely on primarily for the proposition that it matters much, whether or not it's profit or non-profit? I don't—I guess that's a definition that relates to the word commercial. I understand that a non-profit can be involved in commercial activities, certainly. But I think the profit aspect of it is a factor because it's a church, and they're not in it to make a profit. So you're telling me you don't have a case that says that? In fact, I agree with counsel for the government that there are entities that are considered non-profit. The Nature Conservancy is a non-profit, but I think you would argue that it's clearly involved in interstate commercial activities. But an isolated church that is essentially paying some of their bills by renting out a facility, I think not for profit. I think that's just a factor in whether or not this is commercial activity or not. But I want to go back to the issue that counsel raised, U.S. v. Dodd, which is the question of interstate commerce. Again, this is sort of a—I think we have to take the Lopez language that substantially affects, but we also have to take the language of 844, and that language says commerce between any place in a state and any place out of that state. And so that doesn't—I don't see how that could be read any other way except to say that it has to have a substantial effect on commerce in the state of Texas and any place outside of the state of Texas. What about funeral urns that are bought from out of state? Yeah, that was addressed in the reverend's testimony. I think that was—I don't have a great answer for that. I think the answer is that they're obviously buying those urns and providing them to parishioners and buying them from out of state, potentially even shipping them to a parishioner's family who may live out of state. But the church doesn't—they don't make those. They're not— But didn't we— I'm sorry? Didn't we say in Caldwell that that was enough, buying caskets that were manufactured out of state, shipping things out of state, having them shipped in from out of state? Didn't we say in Caldwell that that was enough to establish the interstate commerce connection? I think it can be enough. I think here, though, the testimony was very limited about that issue, and I did not get the sense from the record or from Reverend Balke that that was a routine practice to buy and sell caskets, for example, for St. Stephen's. They may host funerals at the church. I'm not talking specifically about caskets for St. Stephen's, but I'm talking about buying products from out of state. Yes, Judge. So I think that turns it into an instrumentality kind of question. If they were buying those from out of state and then selling them or— I guess you don't rent them, but selling them to parishioners, potentially that could be a commercial activity. Thank you, Your Honor.